The Provident Savings Life Assurance Society

*v.*

Susan B. King.

*Opinion filed June 23, 1905—Rehearing denied October 11, 1905.*

1. Courts—*proper course in assigning cases to Branch Appellate Court.* In assigning cases to the Branch Appellate Court for the First District, the Appellate Court for that district should exercise such discretion as will permit a review of the cases by three justices none of whom has heard the case in the court below, as the constitution and law contemplate.

2. Same—*when order assigning a cause to branch court is improper.* A petition to the First District Appellate Court to set aside an order assigning a cause to the branch court of that district for hearing should be allowed if it appears that one of the justices of said branch court heard the case in the trial court, and was therefore disqualified by the constitution to sit in review.

3. Same—*what will cure improper assignment of cause to the branch court.* Failure of the Appellate Court to allow a petition to set aside an improper order of assignment to branch court is cured by the fact that the judge of the branch court who was objectionable because of having presided at the trial below, left the branch court before either the cause, or a motion made therein during his incumbency, was decided, all judges finally sitting being qualified.

4. Appeals and Errors—*whether evidence justifies findings of fact is a question of fact.* On appeal in a suit at law tried by the court without a jury, the question whether the evidence justifies the findings of fact when the rules of law contained in the propositions held by the court are applied to it is one of fact, upon which the determination of the Appellate Court is final.

5. Evidence—*what competent in proving amount belonging to guaranty fund.* Where the defendant insurance company fails to produce its books upon notice, the plaintiff, in attempting to prove the amount belonging to the defendant's guaranty fund, may show, from the sworn reports of the defendant to various States, the cost of insurance, the estimated or expected mortality based upon standard tables in general use and the actual mortality as reported to such States, and may prove admissions of defendant's general officers that the actual mortality had never exceeded the estimated mortality.

6. Same—*fact that witness is entitled to professional fee does not make his testimony incompetent.* The fact that an expert wit-

ness is entitled to a professional fee as such, contingent upon the result of the suit, affects only his credibility and the weight of his testimony, and does not render his testimony incompetent.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. PHILIP STEIN, Judge, presiding.

PECK, MILLER & STARR, and L. C. KRAUTHOFF, for appellant.

DARROW, MASTERS & WILSON, (EDGAR L. MASTERS, and WILLIAM A. HOWETT, of counsel,) for appellee.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

In this suit the appellee, Susan B. King, recovered a judgment·in the superior court of Cook county on a policy of insurance for $5000 issued by the appellant, the Provident Savings Life Assurance Society of New York, to her husband, Thomas E. E. King, payable to her upon his death. The Branch Appellate Court for the First District affirmed the judgment.

A jury having been waived, the issues of law and fact were submitted to the judge, Philip Stein, and upon a trial before him such issues were found for the plaintiff and judgment was entered accordingly. An appeal was taken to the Appellate Court for the First District, and that court assigned the cause for hearing to the Branch Appellate Court, of which said Philip Stein was one of the justices. There was a preliminary motion by appellee to strike the bill of exceptions from the record, while he was one of the justices, but the motion was not decided and was reserved to the final hearing of the cause. Appellant filed its petition to set aside the order assigning the cause to the branch court and to

216—27

transfer it to the Appellate Court, on the ground that Philip Stein, before whom the cause was tried in the superior court, was one of the justices of the branch court before which the cause was pending for review, and setting forth that only two justices were qualified to hear the appeal while the constitution and law contemplated a review by three justices, and in case of division between the two the judgment would be affirmed by operation of law and the appellant be finally concluded as to the facts upon the decision of but one. The petition was denied and its denial is assigned as error.

Section 11 of article 6 of the constitution provides for the creation of Appellate Courts, to be held by judges of the circuit courts, but provides that no judge shall sit in review upon cases decided by him. By virtue of that provision of the constitution Appellate Courts were created, consisting of three justices, but if one of them has heard the cause he is prohibited by the constitution from taking part in the hearing or decision of the case upon appeal, and if the remaining justices do not agree, the judgment or decree is affirmed by operation of law, and thereby the controverted facts are conclusively determined against the appellant. In 1897 the Branch Appellate Court for the First District was constituted, to which the Appellate Court of that district may assign cases for hearing and decision. It is manifest that the constitution and law contemplate a review by a court consisting of three justices wherever it is possible, and in the First District there may be such a review in every case. The discretion committed to the Appellate Court should be exercised in accordance with the intent of the law and in the interest of parties, so that they may have the benefit of the judgment of three justices and not be concluded as to the facts without a decision upon them. We see no reason, and none is suggested by counsel for appellee, why the petition of appellant should not have been allowed. But it appears that in this case appellant was not prejudiced by the denial. The motion of appellee, made while Philip Stein was one of

the justices of the branch court, was finally decided in favor of appellant, and neither the motion nor the cause was decided until after he had ceased to be a member of the court, on the first Monday of December, 1904. The motion and cause were decided on January 10, 1905, and the justices then composing the court were all qualified to hear and determine the appeal.

Although both parties have argued at great length the questions of fact in controversy in the superior court which have been finally determined by the Appellate Court in favor of appellee, counsel for appellant say that they rely only on certain propositions of law relating, first, to the construction of certain provisions of the policy; second, to the competency of evidence offered in the trial court; and third, to the hearing of the cause in the branch court, which has already been passed upon.

The policy was dated April 16, 1891, and in consideration of the payment of $104.40 Thomas E. E. King was insured for one year. This clause followed: "Said society further agrees to renew and extend this insurance upon like conditions, without medical re-examination, during each successive year of the life from date thereof, upon the payment, on or before the sixteenth day of April in each such year, of the renewal premiums in accordance with the scheduled rates, less the dividends awarded hereon." The policy contained a schedule of yearly renewal rates, increasing in amount progressively from year to year on each $1000 of the insurance. King's age when the policy was issued was forty-eight and he was fifty-seven when he died. Following the schedule of rates there was this clause:

"Regarding the death fund and guaranty fund.—After deducting the expense charge, which is limited to $4 per annum on each $1000 insured, the society agrees to divide the residue of each renewal premium received by it on this policy as follows: Such amount as shall be required for this policy's share of death losses will be appropriated as a death

fund, to be used solely in settlement of death claims. The remainder thereof will be retained as a guaranty fund. The amounts so retained on account of this policy will be used towards offsetting any increase in the premium on this policy from year to year; or, provided this policy, after five full years' premiums have been paid, be terminated solely by non-payment of any stipulated premium when due, eighty per cent of any amounts so retained but not so used will be applied to extend this insurance, or, if application be made therefor while this policy is in full force and effect, to purchase paid-up insurance."

Premiums were paid on the quarterly installment plan from the date of the policy, on April 16, 1891, up to April 16, 1900, but the premium due on the latter date by the terms of the policy was not paid, and King died in October, 1900. Although the schedule rate increased yearly, the premium was increased only twice. It was $28.25 quarterly up to April 16, 1898, when it was increased to $35.31, and it was paid at that rate until another increase on April 16, 1900, to $41.25. The plaintiff testified that about April 1, 1900, she went to the office of the company in Chicago to pay the quarterly premium of $35.31, which had been the rate; that she gave a boy the money, who took it and brought back a receipt, saying that the premium was $41.25; that she told the boy she had not money enough with her to pay, and asked why the premium was raised; that he told her she would have to come again and see the general agent, Mr. McMullen; that she called again in about a week's time and saw Mr. McMullen, and told him that she had brought the money before, and asked him why the premium had been raised; that he answered it was because the death rate had been so heavy the past year, and on account of the death rate there had been no dividend, or but little; that she told him the company would have to carry the policy on, and he said they could not because they had no money in the guaranty fund; that she then asked for a paid-up policy, and he said they

could not do that,—that there was nothing in the guaranty fund and she would have to lose.   Mr. McMullen denied that plaintiff told him the company would have to carry the policy on or that she asked for a paid-up policy.   He testified that he told her the policy was an annual renewable term policy; that the rate had been maintained level for some years by means of the surplus which had been accruing, but that the surplus had been exhausted by the increased cost of insurance, and that it was necessary to charge the rate for the age of the insured, less any small amount that might be left from the preceding year's premium.   Aside from that dispute between plaintiff and McMullen the controversy was over the question of fact whether defendant had in its possession in the guaranty fund sufficient money applicable to the extension of the insurance to keep the policy in force up to the death of the insured.

The proposition of counsel with respect to the construction of the provisions of the policy is, that it was a yearly renewable term policy, which would terminate by its own force at the end of the period for which premiums were paid upon failure of the insured to renew it by making further premium payments.   They insist that it is essential to the proper understanding of the defense made at the trial that the court should hold, as matter of law, that the contract granted insurance for one year, with the right of renewal during each successive year by the payment of the premium.   Upon looking into the record we find that the trial court adopted the same view now insisted upon, and held propositions of law submitted by defendant in accordance with the construction contended for.   One of the propositions thus submitted and held is as follows:

"The court holds, as a matter of law, that the policy of insurance set up in the declaration is a contract for an insurance for the term of one year only, with the right of renewal at the expiration of each year of insurance and during each successive year of the life of the insured, upon the payment,

on or before the 16th day of April in each year, of the renewal premiums in accordance with the schedule rates, less the dividends awarded thereon, and is a term insurance contract for one year."

The defendant had nothing to complain of in the ruling of the trial court on the construction of the policy, since it accorded exactly with the view of its counsel.

It is said, however, by counsel that the ruling of the trial court and the holding of propositions of law were inconsistent with the finding of fact for the plaintiff. We must presume that the court applied to the evidence rules of law held in propositions submitted. If the evidence did not justify the conclusion of fact when the principles of law held in the propositions were applied to it, the finding was still one of fact, just like the verdict of a jury under instructions as to the law, and the power to review such questions is committed to the Appellate Court.

The court held a proposition submitted by the defendant that the eighth replication was not sustained by the evidence in the case, and counsel say that this was a finding of the fact that there was nothing in the guaranty fund, and therefore inconsistent with the general finding. The eighth replication of the plaintiff was to the eighth plea of the defendant, and the eighth plea was to the fourth count of the declaration, which counted upon a New York statute, and alleged that by such statute, after a policy had been in force three years, if there should be a default the reserve of such policy, computed with the surrender value, should be taken as a single premium, and be applied to continue the policy in force or purchase temporary insurance. The finding, therefore, was not that there was no guaranty fund applicable to extending the insurance under the provisions of the contract, and in any event we cannot inquire whether the general finding of fact was proper or not.

It is, perhaps, of little or no consequence whether the policy was a renewable term policy or a continuing policy.

The premium due by its terms on April 16, 1900, was not paid, but it cannot be disputed that if there was anything in the guaranty fund which the defendant was bound to apply to extend the insurance the policy was not terminated. The controversy whether the policy terminated April 16, 1900, depended upon the question whether the guaranty fund was sufficient to continue it in force. Premiums had been paid for five years, and if there was anything in the guaranty fund which had not·been used to keep the premiums level, eighty per cent was to be applied to extend the insurance.

The other alleged error is the admission of incompetent evidence on the part of the plaintiff. It is contended that the policy furnished a definite rule for computing the guaranty fund, which was to come from renewal premiums; that the defendant was not bound to apply its general income, savings and profits to reduce the policy's share of the death fund and thus increase the amount of the general fund, and that the evidence for the plaintiff was based upon computations of general profit and savings of the company, and was therefore incompetent. The policy did provide how the guaranty fund was to be created. It provided for deducting an expense charge limited to $4 per annum on each $1000 of insurance, and the residue of each renewal premium was to be divided by applying such amount as should be required for the policy's share of the death losses as the death fund to be used solely in the settlement of death claims and retaining the balance as a guaranty fund. That fund was to be used in offsetting any increase in the premium from year to year, or, after the payment of five full years' premiums, if the policy should be terminated solely by the non-payment of any stipulated premium when due, eighty per cent of the fund so retained and not used was to be applied to extend the insurance. All the books showing the actual receipts of renewal premiums and the share of this policy of the death losses for each year while it was in force were in the possession of the defendant, in New York City. Upon notice given to produce

them at the trial the defendant offered evidence that they were so great in number and so bulky that they could not well be produced, and that they could not be understood and made useful upon a trial in court, and they were not produced. Plaintiff undertook to make proof of the amount belonging to the guaranty fund by showing from the sworn reports made by the defendant to the State of Wisconsin and the State of Illinois, the cost of insurance, the estimated or expected mortality based on tables in general use in life insurance, the actual mortality as reported to said States, and the cost of insurance. Two standard mortality tables were in evidence, and the reports showed the estimated or expected mortality under defendant's policies and the actual mortality. There was also proof of admissions by general officers of the defendant that the actual mortality had never exceeded the estimated or expected mortality. A witness for the plaintiff, who made extensive computations based on the mortality tables and defendant's reports, testified that the calculations by him did show the amount belonging to the guaranty fund. He qualified as an expert and was competent to testify as such, and the fact that he was entitled to a professional fee contingent on the result of the suit, and was therefore an interested witness, affected only his credibility and the weight to be given to his testimony. His interest did not render the evidence incompetent, and it cannot be said that the evidence introduced by the plaintiff did not tend to prove the amount that should be in the guaranty fund. The reports of the defendant filed in Wisconsin and Illinois were for calendar years, and there was evidence for the defendant that a computation by calendar years would not be accurate as to an individual policy, where, as in this case, the policy was for one year from April 16 and not for one year from January 1, and that the amount of the death fund chargeable to a particular policy for the year of that policy could not be ascertained in that way. In fact, it appears from the testimony of defendant's witness that it could not be ascertained at all ex-

cept by a complicated system of cards, papers and books in its possession.   There was evidence on the part of the defendant of general conclusions from these books that there was nothing in the guaranty fund applicable to the extension of this policy and that it had been necessary to raise the rate of the premium, but the plaintiff had a right to introduce such evidence as was available to her which tended to prove the contrary.   It is doubtless true that there might be some slight difference in the mortality between a calendar year from January 1 and a policy year from April 16 to April 16, but there was no evidence that there was any actual difference, and, taking one year with another, the probabilities are that there would be none.   Taking all the years together while the policy was in force, the entire insurance and the entire mortality were necessarily included.   The evidence for the plaintiff was competent, and tended to prove the fact that there was sufficient money in the guaranty fund to carry the policy to the death of Mr. King.

Mrs. King testified to two conversations, one with an agent of the defendant named Browing, at the time the policy was taken out, in which he told her that it was the best policy they could take because it was non-forfeitable after five years, according to the New York law, and the other with an agent named Ludlow, who was in Chicago engaged in retiring policies like this and giving in their stead nonparticipating policies, in which Ludlow said that he was sent by the New York people to take up the policy, and could give her a very much better rate if she would take a straight ten-year policy in the place of the one she had.   The evidence was irrelevant and immaterial to the issue and it was otherwise incompetent, but it is clear that it could not have affected the result in any way.

We think the testimony as to the admissions of general officers of the defendant that the actual mortality had never exceeded the expected mortality, as shown by the mortality tables and the reports of defendant, was competent.   There

was also other evidence that the actual mortality did not exceed the expected mortality, and there was nothing to contradict it.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*